UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| KYLER NORTHRUP,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>INDIANA DEPT. OF CORRECTION,<br>et al.,<br><br>　　　　Defendants. | CAUSE NO. 3:21-CV-458-RLM-MGG |

OPINION AND ORDER

Kyler Northrup, a prisoner proceeding without a lawyer, moves for a preliminary injunction. The court ordered a response from Westville Correctional Facility Warden John Galipeau, which has now been received.

As a preliminary matter, Warden Galipeau was originally ordered to respond to the motion by August 20. He didn't do so, and the court issued an order requiring him to show cause why the response hadn't been filed. He promptly responded to the show cause order two days after it was issued (and before the deadline set in the order), explaining that defense counsel inadvertently failed to calendar the original deadline because it was set before the Warden entered an appearance in the case. Along with his response to the show cause order, the Warden filed a response to the preliminary injunction motion totaling 432 pages with attachments. Warden Galipeau has since remedied his omission, and his failure to comply with the original order caused only a very short delay in briefing on the motion. Under the

circumstances, the court finds no basis to take any further action against the Warden.[1] The order to show cause is discharged.

Turning to the merits, Mr. Northrup claims that is he receiving constitutionally inadequate care for a shoulder injury. He was granted leave to proceed on damages claims against six medical providers at Westville; a claim under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), against Wexford of Indiana, LLC, and its parent company Wexford Heath Sources, Inc., for maintaining an official policy or custom of failing to adequately train and monitor medical staff and inmate workers in the Westville infirmary; and a claim for permanent injunctive relief against Warden Galipeau related to his ongoing need for constitutionally adequate medical care. In his motion for a preliminary injunction, Mr. Northrup seeks an order requiring that he be immediately taken to an outside medical facility for "shoulder surgery" and "follow-up care."

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

---

[1] This is the second time in recent weeks that counsel for the Indiana Attorney General has missed a deadline this court set for responding to a preliminary injunction, and asserted as an explanation an inadvertent failure to calendar the deadline because no appearance had been filed when the deadline was set. *See* Deane v. Neal, *et al.*, 3:21-CV-315-RLM-MGG. The court understands that mistakes can happen, but in cases filed by a prisoner, an order setting briefing on a preliminary injunction motion often will be issued at screening, before defendants have appeared in the case. The court trusts that counsel will take greater care in the future to review the entire docket at the time an appearance is entered to ensure compliance with deadlines that may have been set earlier.

2

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). On the first prong, "the applicant need not show that [he] definitely will win the case." Illinois Republican Party v. Pritzker, 973 F.3d 760, 763 (7th Cir. 2020). "[A] mere possibility of success is not enough." Id. at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." Id. at 763 (quotation marks omitted). As to the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, 555 U.S. at 22.

Mandatory preliminary injunctions – "those requiring an affirmative act by the defendant" like the one Mr. Northrup seeks – are "cautiously viewed and sparingly issued." Mays v. Dart, 974 F.3d 810, 818 (7th Cir. 2020) (quotation marks omitted). In the prison context, the court's ability to grant injunctive relief is significantly circumscribed; any remedial injunctive relief "must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." Westefer v. Neal, 682 F.3d 679, 681 (7th Cir. 2012) (citations and internal quotation marks omitted).

Under the Eighth Amendment, inmates are entitled to adequate medical care, although "[n]ot every ache and pain or medically recognized condition involving some discomfort" will give rise to an Eighth Amendment claim. Thomas v. Blackard, 2 F.4th 716, 722 (7th Cir. 2021) (citation omitted). Inmates are "not entitled to demand

3

specific care," Walker v. Wexford Health Sources, Inc., 940 F.3d 954, 965 (7th Cir. 2019), or to "the best care possible." Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." Forbes v. Edgar, 112 F.3d at 267. Mere disagreement with a medical professional about the appropriate course of treatment doesn't establish an Eighth Amendment violation. Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir. 2003). Instead, the court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." Walker v. Wexford Health, 940 F.3d at 965 (citation and quotation marks omitted). "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to establish an Eighth Amendment violation. Hildreth v. Butler, 960 F.3d 420, 425–426 (7th Cir. 2020). To prevail, the inmate must show deliberate indifference, "a culpability standard akin to criminal recklessness." Thomas v. Blackard, 2 F.4th at 722.

Warden Galipeau submitted medical records showing that Mr. Northrup is 36-year-old man who suffered a traumatic brain injury before his incarceration, suffers from seizures as a result. Mr. Northrup arrived at Westville in January 2020. He was prescribed the seizure medication Keppra, which is the same medication he took before his incarceration. He has also been given a soft helmet to wear to prevent injury to his head in the event of a seizure. Mr. Northrup broke his right shoulder when he suffered a seizure and fell on November 29, 2020. An emergency signal was called and Mr. Northrup was immediately seen by medical staff. He reported that he "got dizzy on the way to the bathroom" and fell. It was noted that he wasn't wearing

4

his helmet. He acknowledged that he didn't wake up for "med pass" that day and had missed his dose of Keppra. He was given pain medication and an ice pack for his shoulder. An x-ray was taken that day. A prison physician ordered that Mr. Northrup be admitted to the infirmary and given Tylenol 3 with codeine, a cold compress, an elastic bandage, and a splint. (ECF 29 at 1-12.)

Mr. Northrup went to the nurse's station in the infirmary later that night and asked for something to help him sleep. The nurse noted that he had a blank stare and that he was starting to sway backwards. He fell into a nightstand and landed on his right shoulder. The nurse checked his vital signs and did a neurological check, both of which were within normal limits. Mr. Northrup denied feeling dizzy or light-headed and told her, "I don't know what just happened." He told the nurse he had missed about three doses of Keppra that week, which required labs to be drawn. He was told to stay in bed and use the call light if he needed anything and to wear his helmet if he was up walking around. (*Id*. at 13-14.)

A prison doctor saw Mr. Northrup later that morning and said the x-ray showed a fracture of his humerus (the long bone between the elbow joint and the shoulder). The doctor said Mr. Northrup was being referred to an outside orthopedist for evaluation and treatment. Mr. Northrup remained in the infirmary for continued observation for the next 24 hours. He was given over-the-counter pain medications upon his release from the infirmary, with additional prescription pain medications available from medical staff during the daily medication pass. It was noted that "hopefully this will be an incentive for the pt. to get his AM Keppra." He was given a

5

"lay in" pass so that he would be excused from leaving his cell and would have meals brought to him. (*Id.* at 14-31.)

Mr. Northrup's right shoulder was x-rayed again on December 2 in preparation for his offsite orthopedic appointment. An outside orthopedic doctor recommended surgery the next day. Prison medical staff saw him immediately after his return from the visit with the orthopedic doctor. They noted that his sling was in place, and it was ordered that he receive Tylenol 3 with codeine as needed. Medical staff saw Mr. Northrup on December 5 to assess his shoulder. The nurse noted that Mr. Northrup wasn't wearing his sling correctly, and instead had it "loose hanging at his side so it was not being effective." He was reminded on the correct way to wear the sling. Medical staff saw Mr. Northrup on December 7, 9, and 11 to prepare for outpatient surgery on his shoulder. Later on December 11, Mr. Northrup was seen in the urgent care after reporting that he had passed out. He told medical staff that he had missed a dose of Keppra the previous day. He was instructed on the importance of remaining compliant with his medication regimen. (*Id.* at 31-49.)

Medical staff saw Mr. Northrup on December 16 in preparation for his orthopedic surgery scheduled later that day. He declined the offer of an ice pack for shoulder pain and left for the outside hospital. He returned from his offsite surgery around 6:00 p.m. His vital signs were within normal limits. It was noted that he was properly wearing a shoulder immobilizer, and he was given a prescription for Naproxen and Tylenol 3 with codeine for pain. The nurse noted that he wasn't wearing his helmet, and he was reminded to wear the helmet at all times to prevent

6

a head injury should he have a seizure. The nurse noted that Mr. Northrup said he understood, but nevertheless removed his helmet. (*Id.* at 50-62.)

Mr. Northrup stayed in the infirmary for several days. On December 17, it was noted that he was still wearing the shoulder immobilizer and using an ice pack; he was given Tylenol and the prescription medication Toradol for pain. He was given another dose of Toradol later that day. On December 18, he was assessed by medical staff and then observed for the remainder of the day as he rested with his ice pack and shoulder immobilizer. The next day, medical staff conducted an assessment of his shoulder and gave him a prescription for an antibiotic to be taken for 10 days. (*Id.* at 63-79.)

Mr. Northrup was given more medication for pain on December 19. Medical staff reported the next day that he had "good hand grip" and that his surgical dressing remained intact, there was little swelling, and the bruising to his arm was fading. A nurse saw Mr. Northrup "climbing up a window sill," later that day, apparently to close an upper window, and wasn't wearing his helmet. When she asked him what he was doing and why he didn't have his helmet on, he laughed, stepped down from the window, and pointed to the helmet on his bedside table. She again told him to wear the helmet, but according to the nurse, he "just keeps laughing." (*Id.* at 80-97.)

Medical staff reported Mr. Northrup's condition to be improving on December 21. Medical staff observed Mr. Northrup through the night on December 20 and into the morning as he rested in bed. He was again given pain medication. Medical staff assessed Mr. Northrup on the morning of December 22, and he took a shower on his own without incident later that afternoon. Medical staff gave Mr. Northrup ice packs

7

and pain medication on December 23. Staff in the infirmary continued to observe him through the night. (*Id.* at 98-114.)

Another x-ray of Mr. Northrup's right shoulder was taken on December 23 in preparation for a scheduled follow-up appointment with his orthopedic doctor. Medical staff noted that his surgical dressing remained intact that day. His prison doctor ordered that he continue to use Tylenol 3 with codeine until his personal supply was depleted. Later that evening, a nurse was called to Mr. Northrup's bedside because he reported having a seizure. The inmate in the bed next to Mr. Northrup reported that he had "passed out" when he was reaching to change the channel on the television; the nurse noted that he was alert, using clear speech, and in no apparent distress. He wasn't wearing his helmet. Mr. Northrup laughed when this was pointed out to him. (*Id.* at 115-23.)

Medical staff gave pain medication on December 24 and continued to observe him throughout the day. The staff noted no redness or swelling when they removed his surgical dressing, cleaned the area, and put the shoulder immobilizer back on later that afternoon. Medical staff gave Mr. Northrup ice packs and pain medication on December 25. Staff noted the next day that Mr. Northrup was healing "very well." (*Id.* at 123-33.)

Mr. Northrup continued to receive treatment and monitoring of his shoulder in the infirmary over the following week. He was observed for significant changes, given pain medication and ice packs, and had his surgical dressing changed regularly. Mr. Northrup went to a follow-up visit with his orthopedic doctor on January 4. Prison medical staff reviewed the orthopedic doctor's orders the next day. The orthopedist

had ordered that Mr. Northrup was to remove his sling and work on range-of-motion exercises daily, but to wear his sling at all other times. Mr. Northrup wasn't wearing his sling at that time, and he "became defensive" when this was pointed out to him, but voiced an understanding of the orthopedist's orders. Mr. Northrup was discharged from the infirmary on the evening of January 5, and the nurse noted that he "appears in good spirits, laughing and socializing w/ peers." (ECF 30 at 1-83.)

Mr. Northrup had an appointment scheduled with a prison physician on January 13, but for unknown reasons he was a no-show. A shoulder x-ray was taken on January in preparation for his upcoming orthopedic appointment. On January 20, Mr. Northrup visited the medical unit reporting "increased seizures." He reported that he had no shoulder pain while wearing his sling. Mr. Northrup's vital signs were found to be normal after his January 25 follow-up visit with his orthopedist. A prison physician reviewed the orthopedist's orders with Mr. Northrup on January 28: he was to continue doing range-of-motion exercises daily. (*Id.* at 84-100.)

An emergency signal was called on February 2 after Mr. Northrup had another seizure. He wasn't wearing his helmet. He was awake and his vital signs were normal by the time medical staff saw him. Medical staff saw him again on February 4 and 11 for nurse visits. On February 24, his orthopedist recommended physical therapy and another follow-up appointment in six weeks. The orthopedist ordered that Mr. Northrup stop wearing the sling and keep working on increasing his range of motion with daily exercises. Mr. Northrup saw medical staff On February 25 to get clearance to work in the prison kitchen. More x-rays were taken on March 10 in preparation for another orthopedic follow-up appointment. Mr. Northrup was seen by medical staff

9

on March 22 because he had missed eight doses of his seizure medication that month. He had his orthopedic follow-up appointment as scheduled a few days later, and his vital signs were checked upon his return. He was again seen by a nurse on March 29. (*Id*. at 101-28.)

A physical therapist saw Mr. Northrup at the prison on April 8. Mr. Northrup reported a pain level of 0/10 in his shoulder. The therapist gave him instructions on range-of-motion exercises and gave him a hand-squeeze ball to use in his exercises. A prison doctor saw Mr. Northrup on April 29 for his chronic care visit. Mr. Northrup's medications were renewed on May 2. On May 24, Mr. Northrup's orthopedist told him to continue with physical therapy and exercises. Mr. Northrup reported a pain level of 0/10 when he next saw the physical therapist on June 2, though he admitted to "slacking" on his range-of-motion exercises, which he attributed mainly to "being lazy." Mr. Northrup was given a six-month pass for his hand-squeeze ball the next day. He had another follow-up with his orthopedist on June 10, and an additional physical therapy session at the prison on June 17. (*Id*. at 128-49.)

Mr. Northrup filed this lawsuit on June 21, a day when medical staff saw him because he had again missed eight doses of his seizure medication. He had also twice been caught trying to "cheek" or "palm" his medications, meaning that he pretended to take them but would hide them in his cheek or hand until he thought no one was looking. Medical staff saw Mr. Northrup for medication management the same day, and again on June 24 after he was caught "pocketing" his seizure medication, and labs were ordered to be drawn. The nurses started crushing the seizure medication

10

when giving it to him, but on June 26, a nurse saw him pour the crushed medication into the garbage. Mr. Northrup again refused to take his seizure medication on June 27, 28, and 29. On one of those dates, he told the nurse that he refused to accept the medication if it is was crushed and complained that she was denying him medication. It was also noted that he had been seen multiple times without his helmet. Mr. Northrup refused his seizure medication again on July 7. (ECF 30 at 157-163.)

As recounted in detail above, Mr. Northrup has received extensive treatment and monitoring of his shoulder injury. The medical records reflect that from the date of his injury on November 29, 2020, to his filing of the complaint on June 21, 2021, he was seen by medical staff upwards 50 times. Among other things, he has received pain medications, multiple x-rays, outside surgery by an orthopedist, prompt follow-up care, regular dressing changes, and physical therapy. He seems to think he needs another surgery for his shoulder, but there's no indication any medical professional has recommended such treatment. This court must defer to the treatment decisions of prison medical providers unless no minimally competent professional would have responded as they did. Walker v. Wexford Health, 940 F.3d at 965. Given the extensive treatment he has received, the court concludes that Mr. Northrup doesn't meet this standard.

The medical records also reflect that Mr. Northrup hasn't always been cooperative with medical staff or compliant with treatment recommendations. Records show that he has skipped his seizure medication on multiple occasions, which might have led to the seizures that caused and then exacerbated his shoulder injury. He has also neglected to wear the helmet he was given to protect his head should he

have a seizure. His cavalier attitude about his seizure medication and his helmet suggests that he isn't taking his health problems seriously. He admitted to medical staff that he became "lazy" and didn't do the regular range-of-motion exercises he was told he must do to help his shoulder injury heal properly. He can't refuse to cooperate with prison medical staff and then blame them for providing inadequate treatment. The Eighth Amendment doesn't entitle an inmate to the treatment of his choosing, nor can he be permitted to "engineer" a constitutional violation in this fashion. *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005).

Based on the documents before the court, Mr. Northrup hasn't shown that he is likely to succeed on his claim that medical providers have been deliberately indifferent to his shoulder problem. Nor has he demonstrated that he will suffer irreparable injury if he isn't granted immediate relief in the form of an order requiring the Warden to immediately take him to an outside facility for surgery and other treatment.

For these reasons, the order to show cause is DISCHARGED. The motion for a preliminary injunction (ECF 6) is DENIED.

SO ORDERED on September 8, 2021

                                                         s/ Robert L. Miller, Jr.
                                                        JUDGE
                                                        UNITED STATES DISTRICT COURT